Brett A. Greenfield (SBN 217343)
21031 Ventura Blvd, Suite 1101
Woodland Hills, CA. 91364
(818) 724-7272 (voice)
(818) 806-4110 (facsimile)
Brett@818LawGroup.com

*Attorneys for Defendant Mark Roy Anderson*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK ROY ANDERSON,<br><br>Defendant. | Case No. 2:23-CR-00255-FLA<br><br>**SENTENCING MEMORANDUM FOR DEFENDANT MARK ANDERSON IN LIGHT OF BOOK AND 18 USSC 3553; MEMORANDUM; EXHIBITS 1-2; DECLARATION OF BRETT A. GREENFIELD**<br><br>**EVIDENTIARY HEARING REQUESTED**<br><br>DATE: August 23, 2024<br>TIME: 10:00 a.m.<br>CTRM: 6B |

   COMES NOW DEFENDANT MARK ROY ANDERSON, by and through counsel of record, Brett Greenfield, and files this Sentencing Memorandum in which he will respectfully request downward departures based on fast-track resolution and especially in light of his very serious medical conditions.

   This Sentencing Memorandum is based on all the files in this case, Mr. Anderson's contemporaneously filed Objections to Presentence Report, the attached Memorandum of

1 Points and Authorities, Declaration of Brett Greenfield, and Exhibits 1-2, and any argument
2 or testimony which the Court seeks to hear at Mr. Anderson's upcoming Sentencing
3 Hearing.
4 Respectfully submitted,

Dated: August 11, 2024                               818 Law Group, LLP

/s/ Brett A. Greenfield
21031 Ventura Blvd,
Suite 1101
Woodland Hills, CA. 91364
(818) 724-7272 (voice)
(818) 806-4110 (facsimile)
Brett@818LawGroup.com

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. General Principles

Pursuant to 18 U.S.C. § 3553, a district court must strive to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) (citing 18 U.S.C. § 3553(a)). The Supreme Court has described this parsimony provision as the statute's "overarching" principle. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality).

Despite the continuing significance of the Guidelines ranges in formulating the sentence, a district judge should not presume that the ranges are reasonable in all cases. *United States v. Rita*, 551 U.S. 338, 351 (2007). In fact, a sentencing judge has substantial discretion to impose a non-Guidelines sentence if the case before him falls outside the "heartland" of cases to which the Sentencing Commission intends for the Guidelines to apply, or if the sentencing range under the Guidelines does not adequately reflect § 3553(a) considerations, or simply because the judge finds the case warrants a different sentence regardless. *Id.*

For example, a judge's determination that a sentencing range is not sufficiently supported by empirical data or accumulated national experience may supply justification for imposing a sentence outside that range. *Kimbrough*, 552 U.S. at 109–110. Alternatively, a judge may decide to vary from the Guidelines based on policy considerations, including the judge's disagreement with a particular provision of the Guidelines. *Spears v. United States*, 555 U.S. 261, 265–66 (2009) (district court may categorically reject Guidelines, even in a "mine-run" case).

The Supreme Court has further directed that a sentencing judge should consider "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the . . . punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011). In this individualized context, the Guidelines are but one sentencing factor among many that courts must consider, and the

court may not "presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

In particular, a court must look to: (1) the history and characteristics of the defendant, including any criminal record (or lack thereof); (2) the need to provide just punishment for the offense; (3) the nature and circumstances of the offense; (4) the need to avoid unwarranted sentencing disparities; (5) the importance of affording adequate deterrence to criminal conduct; and (6) the need to protect the public from further crimes. *Pepper*, 562 U.S. at 491; *Carty*, 520 F.3d at 991.

Once the judge selects the sentence, he must adequately explain his reasons for choosing it. This allows for meaningful appellate review and promotes the perception of fair sentencing. *Gall*, 552 U.S. at 50; *Rita*, 551 U.S. at 356. The judge's explanation must address the parties' sentencing arguments and, if the judge rejects those arguments, he should explain why. Rita, 551 U.S. at 357. Particularly when a judge rejects a criminal defendant's nonfrivolous argument for a downward variance, he must supply reasons. *Id.*; *Carty*, 520 F.3d at 992–93. Depending on the complexity of the argument and the circumstances, this may call for either a brief explanation or a lengthier one. *Rita*, 551 U.S. at 357.

In *Rita*, the Supreme Court explained that if the district court decides simply to apply the Guidelines, "doing so will not necessarily require a lengthy explanation." Id. at 356. On the other hand, if the judge imposes a sentence outside the Guidelines range, he should explain why and should also justify the extent of the departure or variance from the range. *Gall*, 552 U.S. at 50. The greater the sentence departs or varies from the Guidelines range, the more thorough the judge's explanation must be. *Id*.

///
///
///

### B. MR. ANDERSON SHOULD RECEIVE THE BENEFIT OF FAST-TRACK RESOLUTION

Mr. Anderson should receive the benefits of a fast-track plea agreement. Once the second indictment was filed, undersigned counsel can represent that, upon calling the Government to reach a global settlement, the Government was somewhat surprised. This disposition, of course, seemed like the right one. Given Mr. Anderson's age (70) and his overall health, the risk of trial was too great. As you likely know, this departure can be no more than four (4) points, but Mr. Anderson's decision to enter a plea rather early given, among other things, the voluminous discovery herein, is a worthy candidate for this departure.

The concept of fast-track departures is a creature of more efficient criminal procedure in the wake of so many illegal reentry cases in the federal districts in the United States. *See* 18 USC § 1326 (illegal reentry.) Indeed, it has been codified somewhat in the Sentencing Guidelines at 5K3.1: "Upon motion of the Government, the court may depart downward not more than 4 levels pursuant to an early disposition program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides." Mr. Anderson notes that this language does *not* preclude cases which don't involve illegal reentry.

In 2003, Congress endorsed fast-track pleas by directing the United States Sentencing Commission to promulgate a policy statement authorizing reduced sentences for participants in fast-track programs. *See Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today* (PROTECT) Act of 2003, Pub. L. No. 108-21, § 401(m)(2)(B), 117 Stat. 650, 675 (2003). The Sentencing Guidelines now permit the district court to adjust the offense level of a defendant who participates in a fast-track program not more than four levels downward. *See* U.S.S.G. § 5K3.1. The courts of appeals eventually split over whether a district court could impose a below-Guidelines sentence for a defendant in a district without a fast-track program on the basis of an unwarranted sentencing disparity with a fast-track defendant who had committed the same offense. *Compare*, *e.g.*, *United States v. Gonzalez-Zotelo*, 556 F.3d 736, 739-40 (9th Cir.

5
DEFENDANT'S SENTENCING MEMORANDUM SEEKING DOWNWARD DEPARTURES
REGARDING FAST-TRACK RESOLUTION AND SERIOUS MEDICAL CONCERNS; MEMO; EXHIBITS

2009), with *United States v. Rodriguez*, 527 F.3d 221, 227-29 (1st Cir. 2008). The Department of Justice responded in 2012 by establishing uniform eligibility requirements for fast-track pleas for *all* defendants across the country. *See* MEMORANDUM FOR ALL UNITED STATES ATTORNEYS FROM JAMES M. COLE, Deputy Attorney General, at 2 (Jan. 31, 2012) [hereinafter "Cole Memorandum"], available at http://www.justice.gov/dag/fast-track-program.pdf.

While the details may vary from district to district, all fast-track programs "are based on the premise that a defendant who promptly agrees to participate in such a program saves the government significant and scarce resources that can be used to prosecute other defendants, and . . . has demonstrated an acceptance of responsibility above and beyond what is already taken into account by the adjustments contained in the Sentencing Guidelines." *Id.* at 1. According to the Department of Justice, fast-track plea agreements have, among other things, become an important nationwide tool to address the "compelling, and otherwise potentially intractable, resource issue posed by the number of immigration crimes on the federal criminal docket. *Id.*

In the instant case, it is clear that Mr. Anderson, at his age and given his health issues, wants to rejoin society in the foreseeable future in order to continue being a doting father. In his second case, he has waived indictment by grand jury and has waived his right to appeal his sentence. Mr. Anderson early disposition of this case ensures that the Government will be able to devote significantly more time and resources to other cases, which cases involve some of the most serious matters of our time: national security issues, child pornography, multi-ton shipments of narcotics, etc. Mr. Anderson is deserving of this 4-level downward departure.

### C. <u>A DOWNWARD DEPARTURE BASED ON MR. ANDERSON'S MEDICAL CONDITIONS IS WARRANTED</u>

The sentence imposed must also ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The Sentencing Commission now recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted," and has always recognized that "in the case of a seriously infirm

defendant, home detention may be as efficient as, and less costly than, imprisonment." USSG § 5H1.4.

Before discussing Mr. Anderson's health in more detail, please consider the following information related to life expectancy of men in the United States, which, for the first time in the history of the U.S. is trending downwards, following by the same control facts but with the variable of being incarcerated.



To drill down on the matter a bit more, a "2016 study by Professor Christopher Wildeman offers us an explanation for the U.S. falling behind on measures of population

health, like life expectancy: mass incarceration. In comparison to other developed democracies, Wildeman finds that from 1981 to 2007, the U.S. life expectancy would have increased by more than five years – from 74.1 to 79.4 years – if not for mass incarceration. But given the reality of mass incarceration, the U.S. life expectancy only increased 3.5 years over that time. Without so many people behind bars, he argues, the life expectancy at birth would have increased 51% more than it actually did from 1981 to 2007. The sheer magnitude of how many people are locked up shortens our entire nation's life expectancy." See https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/ (accessed July 3, 2024.))

> Each year in prison takes 2 years off an individual's life expectancy. With over 2.3 million people locked up, mass incarceration has shortened the overall U.S. life expectancy by 5 years.

**Doctors Vu and Pietrusczka**

Mr. Anderson is a man who suffers from, and is at-risk for, several different medical conditions. Attached are true and correct copies of Mr. Anderson's medical records related to previous strokes as well as the potential for both Alzheimer's Disease and Dementia. Upon presentation to a neurologist (See *Exhibit "1"* Decl. Brett Greenfield), Mr. Anderson recently reported a history of hypertension, hyperlipidemia, and a previous right occipital stroke, and to discuss secondary stroke prevention. He reports a daily persistent headache with a sensation of pressure on the left side and takes 400-600mg of ibuprofen several times daily. He experiences cognitive difficulties, including losing his train of thought easily, forgetting what he read a few pages back, and having word-finding difficulties, such as taking a long time to recall the word "chair."

Additionally, he reports intermittent hand tremors, both intentional and at rest, which improve with relaxation, crossing his hands, or drinking water. He does not have a shuffling gait or bradykinesia but does experience positional dizziness, particularly when rising from a seated position.

He has a history of a right occipital stroke attributed to small vessel disease secondary to hypertension (HTN) and hyperlipidemia (HLD). He continues to experience HTN and HLD. He presents with a tremor, specifically an action tremor, which is suspected to be a benign essential tremor and an enhanced physiological tremor. His chronic headaches are classified as tension-type and are suspected to be medication-overuse headaches, with possible sleep apnea as a contributing factor. There is also a concern about possible sleep apnea, along with hypnic jerks. His cognitive symptoms, including memory loss and frequently losing his train of thought, suggest mild to moderate cognitive impairment or dementia, with a likely diagnosis of early-onset Alzheimer's disease[1]; these cognitive issues may also be related to undiagnosed sleep apnea.

An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. It found that at a number of institutions, the Bureau of Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet

---

[1] The statistics at this point are indeed rather bleak. In terms of individuals who are *not* in custody, "an average person diagnosed with Alzheimer's disease between ages 70-79 can expect to survive seven more years…" (*See* https://www.brightfocus.org/alzheimers/article/life-expectancy-after-alzheimers-disease-diagnosis (accessed on July 1, 2024.); *see also* "Alzheimer's Cuts Life Expectancy," at https://www.alzinfo.org/articles/caregiving-26/ (emphasis added):

> Americans with Alzheimer's survived about half as long as those of similar age who did not have the disease. A woman who is diagnosed with Alzheimer's at age 70, for instance, would be expected to live on average for about 8 more years. The typical 70-year-old woman without the disease, on the other hand, would be expected to live another 16 years. *The figures were smaller for American men, who tend to have shorter life expectancies in general: 4.4 years for a 70-year-old man diagnosed with Alzheimer's, versus 9.3 years for a man without the ailment.*

performance target levels on the treatment of serious conditions. *See* U.S. Dep't of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* ii-xix, 32-34 (2008), available at www.justice.gov/oig/reports/BOP/a0808/final.pdf.

Dr. Pietruszka's report is included as Exhibit 2 in the Declaration of Brett Greenfield. Mr. Anderson presented with the following:

- Hypertension: Mr. Anderson is currently being treated for hypertension, which had been uncontrolled in the past. His blood pressure has reached levels as high as 197/132 mmHg. He is currently taking Amlodipine 10 mg daily for his hypertension.
- Hyperlipidemia: Mr. Anderson has a diagnosis of hyperlipidemia, which is a condition characterized by high levels of cholesterol and/or triglycerides in the blood. He is taking Lipitor 20 mg daily for this condition.
- Headache disorder: Mr. Anderson has a diagnosis of a headache disorder.
- Anxiety disorder: Mr. Anderson has a diagnosis of anxiety disorder, which is a condition characterized by excessive and persistent worry or fear. This condition can contribute to and further aggravate his hypertension.
- Prior stroke: Mr. Anderson has a history of a prior stroke that was diagnosed on September 8, 2023. The stroke is described as an old lacunar infarct or asymmetric cerebral spinal fluid space. This stroke affected the right occipital region of the brain.
- Family history of cardiovascular disease: Both of Mr. Anderson's parents had cardiovascular disease, which was the cause of their death. This family history increases Mr. Anderson's risk for cardiovascular events.

The doctor's prognosis/diagnosis for Mr. Anderson going forward is as follows:

- Mr. Anderson has several significant medical conditions, primarily severe hypertension and a prior cerebrovascular accident (stroke) identified as a lacunar infarct.

- He requires close medical attention and ready access to medical care as he is at high risk for suffering a complication from his medical conditions.
- Uncontrolled hypertension is a common cause of a cerebrovascular accident (stroke), and Mr. Anderson's history of high blood pressure puts him at risk for further complications. The CT scan of Mr. Anderson's brain reveals evidence of a prior small stroke that affected the cerebellum, which can cause balance problems.
- Mr. Anderson is currently under treatment with aspirin 81 mg daily, which places him at increased risk for suffering a cerebral bleed should he suffer a fall.

Given his medical history and risk factors, Dr. Pietruszka's opinion is that Mr. Anderson should remain in a setting with ready access to medical care and an environment that reduces his risk of suffering a cerebral bleed or stroke, which could potentially be fatal.

### D. CONCLUSION

Based on the information provided, Defendant Mark Roy Anderson would request that the Honorable Court depart downward in the instant case, given the fast-track disposition herein and / or regarding Mr. Anderson's very serious medical concerns, and sentence him thereby. At the least, he would respectfully request that both matters be considered in the nature of variances, and that, if need be, the Court conduct an evidentiary hearing regarding same.

Respectfully submitted,

Dated: August 11, 2024                   818 Law Group, LLP

/s/ Brett A. Greenfield
21031 Ventura Blvd,
Suite 1101
Woodland Hills, CA. 91364
(818) 724-7272 (voice)
(818) 806-4110 (facsimile)
Brett@818LawGroup.com

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 21031 Ventura Boulevard, Suite 1101, Woodland Hills, California 91364.

On August 11, 2024, I served the foregoing document described as: **SENTENCING MEMORANDUM FOR DEFENDANT MARK ANDERSON IN LIGHT OF BOOK AND 18 USSC 3553; MEMORANDUM; EXHIBITS 1-2; DECLARATION OF BRETT A. GREENFIELD** on said parties in this action as follows:

## SEE ATTACHED SERVICE LIST

**BY MAIL:** I am familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on August 11, 2024, at Los Angeles, California.

*J. Brantveyn* [E-Signature]

---
Julie Brantveyn

**ATTACHED SERVICE LIST**

**Kerry L. Quinn | Assistant United States Attorney**
Major Frauds Section
United States Attorney's Office, Central District of California
1100 U.S. Courthouse
312 N. Spring Street,
Los Angeles, CA 90012
(213) 894-5423 (office)
Kerry.L.Quinn@usdoj.gov (email)